**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JARED W. RUSSELL,<br><br>    Defendant and Appellant. | F064550<br><br>(Super. Ct. No. CRF36187)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on February 4, 2014, be modified as follows:

On page 19 the last paragraph of section VI. of the Discussion beginning with "We find that the threat made by Russell …" is deleted.  The following paragraph is inserted in its place:

> In any event, even if lesser included instructions should have been given, we conclude that there is no reasonable probability that the failure to give a lesser included offense instruction affected the outcome of the trial. (*People v. Joiner* (2000) 84 Cal.App.4th 946, 972; *People v. Breverman* (1998) 19 Cal.4th 142, 177-178; *People v. Watson, supra,* 46 Cal.2d at p. 836.)  Examining the evidence as a whole and, as is appropriate to do in reference to the question of prejudice, examining its strength and weaknesses (*Breverman, supra,* at p. 177), we conclude that there is no

reasonable probability the failure to give a lesser included offense instruction affected the outcome of the trial.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

                        _____
                                      Franson, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Kane, J.

2.

Filed 2/4/14 (unmodified version)

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JARED W. RUSSELL,<br><br>  Defendant and Appellant. | F064550<br><br>(Super. Ct. No. CRF36187)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County. Eleanor Provost, Judge.

Gabriel Bassan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and George M. Hendrickson, Deputy Attorneys General, Plaintiff and Respondent.

-ooOoo-

Following a jury trial, appellant Jared W. Russell was convicted of one count of making a criminal threat (Pen. Code, § 422)[1] and one count of carrying a concealed dirk or dagger (former § 12020, subd. (a)(4)). He was acquitted of one count of corporal injury to a cohabitant and parent of his child (§ 273.5, subd. (a)). Russell was sentenced to two years in state prison on the criminal threat conviction, with a concurrent two-year term on the concealed weapon conviction.

On appeal, Russell contends: (1) the trial court improperly allowed evidence of his previous domestic violence; (2) the trial court precluded evidence of the complaining witness's prior domestic violence and prior violent acts for impeachment purposes; (3) the cumulative evidentiary errors resulted in prejudice; (4) there is insufficient evidence to uphold the conviction for carrying a concealed dirk or dagger; (5) the trial court failed to correctly instruct on the elements of the offense of carrying a concealed dirk or dagger; (6) the trial court failed to instruct on the lesser included offense of attempted criminal threat; (7) the prosecutor committed repeated misconduct in closing argument; (8) the trial court erred in removing Russell's father from the courtroom; and (9) counsel was ineffective. We disagree and affirm.

## STATEMENT OF THE FACTS

On July 19, 2011, around 8:00 in the evening, Erin Hall (Ms. Hall) received a phone call from her cousin and Russell's girlfriend, Allison Artzer, who asked Ms. Hall to come and get her and Artzer's five-year-old son. Artzer said Ms. Hall should probably bring her husband Steve (Mr. Hall). Artzer had been spending "a lot of time" at the Halls' because it was a "safe place" where she would go if she and Russell had been fighting. In response to Artzer's call, the Halls left immediately and drove the three miles to Artzer's apartment. They had their 19-year-old daughter with them.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

After calling Ms. Hall, Artzer took her son and went across the street to the apartment of a neighbor, Brandon Shults. According to Shults, Artzer was "really upset" and said Russell was trying to hurt her. She showed Shults a mark on her arm. Russell was outside his apartment yelling for Artzer. Shults locked the door and called 9-1-1.

When the Halls arrived, Artzer came out of Shults's apartment and talked to Ms. Hall. Artzer seemed "[e]xtremely scared," and asked Ms. Hall to take her car keys because Russell was trying to get into her car.

While this was happening, Mr. Hall knocked on the door of the apartment where Russell and Artzer lived. When Russell came to the door, Mr. Hall asked him several times why he was "beating on" Artzer. Russell, who was "pretty excited" and "fired up," did not answer, but his right hand was clenched in an aggressive manner and he lunged at Mr. Hall, who was considerably smaller than Russell. Mr. Hall punched Russell in the jaw. He fell straight back and was down for about 10 seconds to a minute. When Russell sat up, he said, "It's on. Now you're going to jail. You're going to jail. It's on." Artzer yelled, "No, he's not. No, he's not." Russell then started to get up, and Mr. Hall punched him again.

Ms. Hall suggested that she and Mr. Hall go to their car and call 9-1-1. Russell got up and the Halls saw he had a piece of metal in his hands. Russell then threw the handle of a hydraulic jack at the Halls. At this point, Mr. Hall was sitting in the car and Ms. Hall hid on the far side of the car as the jack flew over them and hit a nearby tree.

Russell then got a tire iron from his truck, walked toward the Hall's car and looked like he was going to swing the tire iron at the passenger side window. Mr. Hall started the car and drove away toward a knoll where they could look down onto the apartment complex. They called 9-1-1 again and waited for the police. When Russell saw them, he yelled, "I'm going to stab you with a knife." These words form the basis of the criminal threat charge.

3.

When Officers Dennis Townsend and Andrew Theodore arrived, Russell, who was standing outside the porch area of his apartment, had something in his hand and stepped forward. Officer Theodore drew his gun and ordered Russell to step away from the apartment and kneel on the ground. Officer Townsend found a serrated kitchen knife in Russell's pants pocket. The blade of the handle was up and the knife covered by his T-shirt. A tire iron was found in the bed of Russell's truck. The screen door and door of the apartment were damaged and the screen had been removed from a window.

After Russell was placed in the patrol car, Artzer came over and told Officer Theodore she had had an argument with Russell, that she tried to leave, and that Russell took her car keys and her arm was cut in the struggle. She also said Russell had punched her numerous times in the back of the head. When Russell was outside, Artzer locked the front door, grabbed her son, and fled though the back door to Shults's apartment as Russell kicked in the front door. Artzer wanted a protective order against Russell. Officer Townsend noted a lump on Artzer's head. Artzer said that Russell had told her previously that he hit her there "because it doesn't leave marks that the cops could find." Artzer told Officer Theodore she did not see what had happened between Russell and Mr. Hall. She did not appear to be intoxicated.

Artzer had also told Ms. Hall that Russell had hit her in the back of the head that evening. Artzer had a cut and a bruise on her back and a bruise on her face as well. Ms. Hall heard Artzer tell officers that Russell hits her in the back of the head because it does not leave marks.

Russell told the officers that nothing had happened except that he and Artzer had had a verbal altercation. When speaking to the officers, Russell was angry and yelling and used profanity in answering simple questions. When placed in the patrol car, he made mocking "crying noises" directed at Artzer and shouted profanity toward the arresting officer, Artzer, and the Halls.

4.

As trial approached, Artzer and Russell reconciled and Artzer asked the Halls to change their testimony about what had happened, but both refused. When Ms. Hall refused, Artzer ended her relationship with her.

At trial, Artzer testified that, on the date of the incident, she and Russell had had an argument. When she was in the kitchen and Russell was on the back porch, she had said something that made Russell mad and she tried to close the side door to keep him out. They both pushed on the door from opposite sides, breaking the door jamb. Artzer had some cuts on her arm and back, but did not know how they happened because she was intoxicated.

Artzer testified that she ran to Shults's apartment, where she called Ms. Hall to come pick her up. When the Halls arrived and knocked on the door of Russell's apartment, Artzer ran outside from Shults's apartment. Russell told Mr. Hall that he did not hit Artzer but, if he had, "she deserved it." Mr. Hall then hit Russell and he fell into the screen door, damaging it, and he lay unconscious for about 15 seconds. When Russell got up, Mr. Hall hit him again.

The Halls then walked to their car and Russell picked up a long piece of metal and also walked toward the car. The Halls drove away. Artzer testified she did not see anything after that, and denied telling a defense investigator she had watched the events through the bathroom window of Shults's apartment.

Artzer testified that Russell had never hit her in the back of the head, but on redirect examination, said he had. Artzer did not remember telling officers that Russell had tried to take her keys or that Russell had hit her in the past. But she acknowledged telling officers that she was scared for her safety and the safety of her son and that she grabbed him and took him to Shults's apartment. Artzer testified that she had been arrested for domestic violence the previous year. She said that Mr. Hall "has a violent history himself." Artzer acknowledged that she and Russell had reconciled before the trial.

5.

Defense Investigator Bill Perreira testified that Artzer told him she had been looking through the neighbor's bathroom window when she saw Mr. Hall punch Russell in the face, knocking him out. Artzer told Perreira that Russell had hit her that evening.

Russell testified in his own behalf that he and Artzer had been arguing and she tried to lock him out, which caused a struggle at the side door. Russell denied hitting Artzer. According to Russell, Artzer took their son across the street. Later, Mr. Hall knocked on the door and asked him why he was beating Artzer. When Russell did not answer, Mr. Hall hit him in the face, knocking him unconscious. Russell did not remember saying anything to Mr. Hall after that, and he did not remember throwing a pipe, walking toward the Halls' vehicle with a tire iron, or having a knife in his pocket. According to Russell, he hid knives from the house in his toolbox to keep them away from Artzer, because she is a "self-mutilator." Russell testified that Artzer had been previously arrested for biting him, but the charge was dropped.

## DISCUSSION

### I. EVIDENCE OF RUSSELL'S PREVIOUS DOMESTIC VIOLENCE

Russell contends that the trial court erred in admitting evidence of prior domestic violence under Evidence Code section 1109 because the court failed to conduct the required weighing process under Evidence Code section 352, requiring per se reversal. Respondent asserts the issue was forfeited and, that in any event, no prejudicial error occurred. We agree with respondent.

*Procedural History*

During discussion of preliminary matters, the prosecutor stated that she "anticipate[d] that past domestic violence is going to come up … [a]nd so, I'm just putting the court on notice that under 1108 and 1109, I think it will be relevant." Defense counsel objected, stating "[t]here is no conviction. It was something [Artzer's] saying in anger when she's talking to the cop .…" The trial court replied, "The code now calls for that, so I will allow it."

6.

Subsequently, during direct examination of Artzer, the prosecutor asked if there had been a prior incident of domestic violence in her home. Artzer answered that only she, not Russell, had been arrested for domestic violence. Defense counsel objected on grounds of relevance, but Artzer had answered before the court could rule and counsel did not move to exclude the evidence. Artzer then testified without objection that she told officers Russell had hit her in the back of the head because the Halls "had caused such an issue … coming there .…" She testified that Russell had not hit her on the date of the charged offenses.

On redirect examination, Artzer testified without objection that she did not remember how many times Russell had hit her. When the prosecutor asked, "So many you can't remember," defense counsel objected on grounds that the question was argumentative. After again asking how many times Russell had previously hit Artzer, she replied, "I guess, once."

### *Applicable Law and Analysis*

Evidence Code section 1109, subdivision (a)(1) provides, "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Under Evidence Code section 352, "the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Respondent asserts Russell has failed to preserve the issue on the basis he now contends. But even assuming all proper objections were made and the evidence was improperly admitted, it cannot be said Russell would not have received a more favorable result, even absent the evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837; see *People v. Riccardi* (2012) 54 Cal.4th 758, 804.) The purpose of the prior domestic

7.

violence evidence was to show that Russell had, in fact, struck Artzer. But the jury acquitted Russell on the only charge based on violence against Artzer. And it cannot be said that the evidence of Russell's prior domestic violence was the only evidence to convict him of the other charges. Instead, those charges were supported by the testimony of the Halls, as well as Shults, and by the officers' observations of Russell's behavior and their discovery of the jack handle he threw, the tire iron he used to threaten the Halls, and the knife in his pocket. No prejudicial error occurred.

## II. EVIDENCE OF PRIOR VIOLENCE BY A COMPLAINING WITNESS

Russell next contends that the trial court erred when it "denied admission … outright" of evidence of "previous domestic violence" by Mr. Hall "for which he had been convicted, and which was being offered to show [Mr. Hall's] propensity for violence." Respondent asserts that the issue was waived and, in any event, no constitutional violation occurred. We agree with respondent.

### *Procedural History*

Prior to the presentation of evidence, during a discussion of the parties' witness lists, the trial court noted that Ms. Hall was listed on both. The prosecutor stated that Ms. Hall was on her list because she was Artzer's cousin and also wife of Mr. Hall, who was at the scene. Defense counsel stated she was on his list because she was "a victim of domestic violence perpetrated by [Mr.] Hall." When the trial court asked "What's that got to do with anything," defense counsel stated that it went to Mr. Hall's "propensity for violence" and "impeachment." The trial court stated that it would not let that in.

Later, in the discussion of witnesses, defense counsel again brought up Mr. Hall, this time stating he wished to "use the domestic violence" to impeach Mr. Hall because he went to Russell's house and assaulted him. The trial court stated, "No. Let me hear the testimony, but I don't think so." The prosecutor noted that the prior conviction for Mr. Hall occurred in 2001, making it "remote in time" and not relevant. Again, the trial court stated, "I don't think I'm going to let it in." But the trial court also stated, "if you

8.

think it's all of a sudden become more relevant, you let me know and we'll go in the back." At trial, defense counsel made no further request to introduce the evidence.

*Applicable Law and Analysis*

In general, a defendant in a prosecution for an assaultive crime who has raised self-defense is authorized under Evidence Code section 1103 to present evidence of the violent character of the victim via the victim's prior and subsequent acts of violence to show the victim, in this case Mr. Hall, was the aggressor. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446-448.) Evidence Code section 1103, subdivision (a), provides in pertinent part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." The trial court however has broad discretion under Evidence Code section 352 to exclude such character evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Shoemaker, supra,* at p. 448.)

These evidentiary rules also apply to evidence sought to be admitted for impeachment purposes. (*People v. Hill* (1995) 34 Cal.App.4th 727, 738.) "Although wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness, the court retains discretion to exclude collateral matters. [Citations.]" (*Ibid.*) In this regard, "a state court's application of ordinary rules of evidence - including the rule stated in Evidence Code section 352 - generally does not infringe upon [a defendant's federal constitutional right to present a defense]. [Citations.]" (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

9.

Similarly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on … cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) The confrontation clause guarantees only "'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (*U.S. v. Owens* (1988) 484 U.S. 554, 559.) Therefore, there is no violation of the Sixth Amendment right to present a defense "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' …." (*People v. Frye* (1998) 18 Cal.4th 894, 946, overruled on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

We agree with respondent that, because defense counsel made no further request, the issue was forfeited. But we will address the issue because Russell alternatively contends that, if the issue was forfeited, the failure to preserve the issue demonstrated ineffective assistance of counsel. The constitutional right to effective assistance of counsel is violated when an attorney fails to perform as a reasonably competent attorney, and it is reasonably probable that, absent counsel's deficiencies, a more favorable result would have been obtained. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; see also *In re Wilson* (1992) 3 Cal.4th 945, 950.)

The evidence at trial was that Mr. Hall went to Russell's apartment to ask why he was abusing Artzer. When Russell lunged at him with a clenched fist, Mr. Hall hit Russell. Russell then sat up, said, "It's on," and started to get up when Mr. Hall punched him again. The Halls then went to their car and Russell threw a metal rod at them. Russell then got a tire iron and walked toward them. The Halls drove off and stopped their car some distance away. It was then that Russell saw them and yelled, "I'm going to stab you with a knife," the threat that was at the center of the criminal threat allegation.

Thus, the jury had before it evidence that Mr. Hall threw the first two punches. We also note that Artzer, in her testimony at trial, at one point testified that Mr. Hall "has a violent history himself," without objection from either party. Therefore, because of this evidence of Mr. Hall's earlier violent actions, it is therefore not reasonably probable that, if defense counsel has pursued the admission of evidence of Mr. Hall's propensity for violence through a previous domestic violence conviction, as Russell now urges on appeal, there would have been a more favorable result. We reject Russell's argument to the contrary.

## III. CUMULATIVE EVIDENTIARY ERRORS

Russell contends that the cumulative effect of the above evidentiary errors kept him from receiving a fair trial. We have either rejected Russell's claims of error and/or found that any evidentiary errors, assumed or not, were nonprejudicial on an individual basis. Viewed cumulatively, we find that any evidentiary errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## IV. SUFFICIENCY OF THE EVIDENCE

Russell next contends there is insufficient evidence to uphold his conviction for carrying a concealed dirk or dagger under former section 12020, subdivision (a)(4). Specifically, Russell maintains that the evidence shows he carried the steak knife found in his pocket only while in his home or on his property and a reading of the statute to include such conduct would be constitutionally overbroad. Russell cites *In re Bergen* (1923) 61 Cal.App. 226 (*Bergen*) in support of his contention.

> "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to

11.

determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Former section 12020, subdivision (a)(4), prohibited any person from carrying upon his or her person a concealed "dirk" or "dagger."[2] Section 12020, subdivision (c)(24), in turn, provided, "[A] 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." To be convicted, the defendant must (1) "'knowingly and intentionally carry [the] concealed'" instrument, and (2) know the instrument "'is capable of ready use as a stabbing weapon.' … A defendant who does not know he is carrying the weapon or that the concealed instrument may be used as a stabbing weapon is therefore not guilty of violating section 12020." (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332, fn. omitted (*Rubalcava*).) Proof of intent "to use the instrument as a stabbing weapon[]" is not an element of the crime. (*Id.* at p. 333.)

In *People v. Grubb* (1965) 63 Cal.2d 614 (*Grubb*), superseded by statute on other grounds in *Rubalcava, supra,* 23 Cal.4th at pages 329-331, our Supreme Court upheld the constitutionality of section 12020 against a void-for-vagueness challenge. Construing the statute "in the light of the legislative design and purpose" (*Grubb*, *supra,* at p. 620), the court found:

> "The Legislature here sought to outlaw the classic instruments of violence and their homemade equivalents; the Legislature sought likewise to outlaw possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the

---

**2** Former section 12020 is now repealed. (See Stats. 2010, ch. 711, § 4.) At present, section 21310 reads: "[A]ny person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

alteration of the object from the standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose. [Citation.]" (*Id.* at pp. 620-621, fn. omitted.)

"The concomitant circumstances may well proclaim the danger of even the innocent-appearing utensil. The Legislature thus decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger." (*Id.* at p. 621.)

"We recognize that the presence of suspicious circumstances attendant to possession of the proscribed object does not forge an ironclad case against defendant. He may be able to demonstrate an innocent usage of the object but the burden falls upon him to do so." (*Id.* at p. 621, fn. omitted.)

The holding in *Grubb* that section 12020 is not unconstitutionally vague was reaffirmed in *Rubalcava, supra,* 23 Cal.4th 322, even though "[a]s written, section 12020, subdivision[ ] (a) … may criminalize seemingly innocent conduct." (*Id.* at p. 333.) "[T]he statute may invite arbitrary and discriminatory enforcement *not* due to any vagueness in the statutory language but due to the wide range of otherwise innocent conduct it proscribes." (*Ibid.*) The Supreme Court observed that, although former section 12020, subdivision (a)(4), could be read on its face as criminalizing the carrying of legal instruments such as steak knives, scissors and metal knitting needles, there was "'no need to carry such items concealed in public.'" (*Rubalcava, supra,* at p. 330.) In the end, the Supreme Court ruled that it would "not find [former section 12020, subdivision (a)(4),] *unconstitutionally* overbroad without some concrete impairment of constitutionally protected conduct." (*Id.* at p. 333, italics in original; see also *People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1377.)

Here, the evidence "in the light most favorable to the People" (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206), is that when Officer Townsend first drove up to the apartment, Russell was not in his own apartment, but "standing outside the porch area" "looking back and forth." Officer Theodore, who followed Officer Townsend to the site, saw Russell standing in the open doorway of the apartment. Russell was then detained

13.

and a "serrated kitchen knife" was found in his pants pocket covered by his T-shirt. There was no evidence that Russell offered an innocent explanation to officers for his possession of the knife at the time it was discovered. At trial, Russell claimed that he was barbecuing that night, but officers who detained him did not smell any barbecue or see any evidence of barbecuing at the apartment. Russell also claimed that he had no recollection of putting the knife in his pocket, but that if he did put it here, it would have been to keep it away from Artzer.

*Bergen* does not help Russell. In that case, the defendant was charged by complaint with violating a statute which proscribed carrying a concealed firearm without a license. However, the complaint alleged that the defendant violated the statute by "conceal[ing] upon his person one … Pistol, without a license to carry such firearm." (*Bergen, supra,* 61 Cal.App. at p. 227.) The appellate court found that the complaint did not state facts sufficient to constitute a violation of the statute as the "absence of an allegation of 'carrying' leaves the accusation defective, not merely in form, but in substance …." (*Id.* at p. 228.) "[T]he purpose of the [L]egislature in enacting this law was to prevent citizens from going armed in such fashion as to constitute a danger to the public; we think it was not designed to prohibit the concealment of a weapon upon one's person on his own premises or in his own home." (*Id.* at p. 228.)

In this case, Russell was charged with violating section 12020, subdivision (a)(4), which proscribes carrying a concealed dirk or dagger on one's person, and the record supports the finding that Russell carried a concealed knife on his person outside his apartment. The jury could reasonably conclude that, by his actions, Russell was "going armed in such fashion as to constitute a danger to the public …." (*Bergen, supra,* 61 Cal.App. at p. 228.) Russell was not "on his own premises or in his own home" (*ibid.*), and the circumstances surrounding Russell's conduct supports the finding that he violated "the legislative design and purpose" of section 12020, subdivision (a)(4). (*Grubb, supra,* 63 Cal.2d at p. 620.)

## V. INSTRUCTIONAL ERROR

Russell argues that the trial court prejudicially erred when it failed to include certain language in CALCRIM No. 2501 on the elements of carrying a concealed dirk or dagger pursuant to section 12020. We disagree.

As stated above, Russell was convicted of a violation of section 12020, subdivision (a)(4), which made it illegal for a person to carry "concealed upon his or her person any dirk or dagger." The jury was instructed with CALCRIM No. 2501 as follows:

> "The defendant is charged in Count 3 with unlawfully carrying a concealed dirk or dagger in violation of Penal Code section 12020(a)(4). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant carried on his person a dirk or dagger; [¶] Two, the defendant knew that he was carrying it; [¶] Three, it was substantially concealed on the defendant's person; [¶] And four, the defendant knew that it could readily be used as a stabbing weapon. [¶] The People do not have to prove that the defendant used or intended to use the alleged dirk or dagger as a weapon. [¶] A dirk or dagger is a knife or other instruments with or without a hand guard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. Great bodily injury means significant or substantial physical injury. It's an injury that is greater than minor or moderate harm. [¶] A knife carried in a sheath and worn openly suspended from the waist of the wearer is not concealed."

In giving the instruction, the trial court did not include the following paragraph, which is to be given "only if object may have innocent uses." (See CALCRIM No. 2501.):

> "When deciding whether the defendant knew the object ( … could be used as a stabbing weapon), consider all the surrounding circumstances, including the time and place of possession. Consider also (the destination of the defendant[,]/the alteration of the object from standard form[,]) and other facts, if any."

Russell contends that the trial court had a sua sponte duty to give the above paragraph where, as here, the "common household steak knife may have innocent uses."

15.

Russell also contends that the trial court had a sua sponte duty to instruct on his mental state, pursuant to CALCRIM No. 252, which instructs on the joint union of act and intent. Russell argues that failure to give these instructions was failure "to instruct the jury on the mental-state element of [Russell's] knowledge that the instrument was possessed 'as a weapon,'" (boldface and some capitalization omitted) and therefore the jury was not instructed on all of the elements of the charged crime.

We disagree. As stated in the instruction as given, "dirk or dagger" is defined as a "knife or other instrument" that is "capable of ready use as a stabbing weapon." Here, there is no dispute Russell had a "knife" within the meaning of section 12020. In addition, the instruction as given required the jury to find that Russell knew that the knife could readily be used as a stabbing weapon. The additional language Russell now contends should have been given was not necessary.

## VI. INSTRUCTIONAL ERROR ON LESSER INCLUDE OFFENSE

Russell next argues that the trial court was required to instruct the jury on an attempt to make a criminal threat under section 422, a lesser included offense of the violation of section 422 charged in Count II. We disagree.

A trial court has a duty to instruct the jury on any offense "necessarily included" in the charged offense if substantial evidence lends support for the lesser crime's commission. (*People v. Birks* (1998) 19 Cal.4th 108, 112.) As the California Supreme Court has explained, "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*Id.* at p. 117.) "This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (*Id.* at p. 112.)

Even in the absence of a request for an instruction on the lesser included offense, the trial court must give the instruction if a reasonable jury might find the evidence of the lesser offense persuasive. (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) But, "the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) "[W]e review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole, supra,* at p. 1215.)

Section 422 was enacted to target "'those who try to instill fear in others,'" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) In order to prove a violation of section 422, the prosecution must establish (1) that the defendant "'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person'"; (2) that the defendant made the threat "'with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out'"; (3) that the threat was "'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat'"; (4) that the threat actually caused the person threatened "'to be in sustained fear for his or her own safety or for his or her immediate family's safety'"; and (5) that the threatened person's fear was "'reaonabl[e]'" under the circumstances. (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

> "A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution ….'" [Citation.] In addition, section 422 does not require an intent to actually carry out the threatened crime. [Citation.] Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety

17.

of his or her immediate family. [Citation.]" (*People v. Wilson, supra,* 186 Cal.App.4th at p. 806.)

Attempted criminal threat is a lesser included offense of criminal threat. (*People v. Toledo, supra,* 26 Cal.4th at pp. 226, 230.) In *Toledo*, the California Supreme Court explained that a person commits an attempted criminal threat "if a defendant, … acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Id.* at p. 231, italics in original.)

Russell contends the evidence that the Halls experienced sustained fear was lacking so the trial court had a duty to instruct sua sponte on attempted criminal threat. We disagree.

The evidence at trial was that, after Mr. Hall confronted Russell and punched him twice, Russell got up and threw a metal pipe near Ms. Hall as she attempted to get into her vehicle. Russell then approached the vehicle with a jack handle as the Halls drove away. When Russell saw the Halls parked up on a nearby hill, he yelled, "I'm going to stab you with a knife" while acting "pretty nuts." Mr. Hall then drove to a more remote location until officers told him it was safe to return.

When they returned, Russell was in the back of the police vehicle. He was described by Mr. Hall as "completely wild," and "yelled and screamed and hollered and just was completely out of his head" for 45 minutes.

Ms. Hall testified that she remained in fear, noting that she had, since the incident, gone to several court dates with Artzer where Russell harassed them by circling the block while Artzer was trying to get to her car. At one court date, the trial judge had Ms. Hall and Artzer wait in the courtroom for Russell to leave first because he was so upset.

18.

Although, as Russell notes, Mr. Hall testified that he was not "concerned" about being stabbed while he was parked at a distance on the hill, he also testified that he took the threat seriously and was still concerned that Russell might attack him.

As stated earlier, section 422 does not require the immediate ability to carry out a threat. (*People v. Wilson, supra,* 186 Cal.App.4th at pp. 806-807.) In *People v. Wilson,* the court held that the defendant's threat to kill a prison guard when he was released in 10 months was sufficiently immediate to violate section 422. (*Wilson, supra,* at p. 814.) Here Russell, in a rage, made a threat to kill the Halls which, under the circumstances, he could only carry out after police were no longer on the scene.

We find that the threat made by Russell was more than sufficient to violate section 422, since the threat extended into the indefinite future and there was no "fortuity, not intended by the defendant, [which] prevented the defendant from perpetrating the completed offense of criminal threat itself." (*People v. Toledo, supra,* 26 Cal.4th at p. 231.) As a result, there was no basis on which the jury might have found Russell guilty of an attempt but not the complete offense. (*People v. Friend* (2009) 47 Cal.4th 1, 51-52.) Thus, there was no basis to instruct on the lesser included offense.

VII.    PROSECUTORIAL MISCONDUCT

Russell contends that, in three separate ways, the prosecutor committed misconduct and thus violated his right to due process and a fair trial. He asserts the prosecutor engaged in misconduct in closing argument, when she argued that the pattern of recollection claimed by Russell was inconsistent with amnesia due to a concussion, when she argued that Artzer's inconsistent testimony fit the pattern of domestic violence, and when she made an improper plea to the jury involving Artzer and Russell's child. We find no prejudicial error.

> "'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the

conviction a denial of due process.""" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Prosecutorial misconduct requires reversal only if it prejudices the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates only state law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

The issue of prosecutorial misconduct is forfeited on appeal if not preserved by timely objection and request for admonition in the trial court. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1000.) If an objection has not been made, """"the point is reviewable only if an admonition would not have cured the harm caused by the misconduct" [citations]'" (*id.* at pp. 1000-1001) or if an objection would have been futile (*People v. Hill* (1998) 17 Cal.4th 800, 820-821).

Here, defense counsel never objected on the grounds of prosecutorial misconduct and did not request that the jury be admonished, thereby forfeiting the claim on appeal. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1000.) But even on the merits, we find Russell's claim lacking, and for that reason do not need to discuss his further claim of ineffective assistance of counsel for failing to object.

Russell points to the following three instances in which he claims prosecutorial misconduct occurred.

First, Russell complains that the prosecutor argued in closing and rebuttal that, although Russell testified to details of what happened immediately before Mr. Hall hit

20.

him and was able to quote exact statements by both of them, he was unable to relay subsequent events, particularly throwing the metal pipe, menacing the Halls with the tire iron, having a knife in his pocket, and threatening to stab the Halls. Russell contends that the prosecutor's comment, that "[s]omebody with a concussion generally doesn't remember details before" constituted improper "expert testimony."

Second, Russell argues that the prosecutor committed misconduct in arguing that Artzer exhibited "very classic domestic violence" symptoms, and her inconsistent testimony was likely due to a "cycle" of domestic violence. Russell argues such argument was improper expert argument of which the prosecutor had no knowledge.

Finally, Russell argues that the prosecutor's plea in closing, to consider the situation of the child in this situation because a child cannot protect himself in a domestic violence dispute, was an improper plea to passion for the jury to convict and was also improper expert testimony.

A prosecutor is entitled to comment on the credibility of a witness based on evidence adduced at trial. (*People v. Thomas* (1992) 2 Cal.4th 489, 529.) What a prosecutor may not do is suggest that he or she has information undisclosed to the jury bearing on the issue of credibility, veracity, or guilt. The danger in such remarks is that the jurors will believe that some inculpatory evidence, known only to the prosecution, has been withheld from them. (*People v. Padilla* (1995) 11 Cal.4th 891, 946, overruled on other grounds in *People v. Hill*, *supra,* 17 Cal.4th at p. 823, fn. 1; *People v. Green* (1980) 27 Cal.3d 1, 35.)

Even if we agree with Russell that the prosecutor's remarks were objectionable, we find no prejudice. The trial court instructed the jury that nothing the attorneys said during closing argument was evidence and that the jury could not be influenced by "bias, sympathy, prejudice, … public opinion," or "bias for or against the witnesses, attorneys, defendant, or alleged victim." The jury is presumed to have followed the court's instructions. (*People v. Wash* (1993) 6 Cal.4th 215, 263.)

21.

Finally, there is no reasonable likelihood that the jury construed or applied the challenged comments, whether singly or together, for improper purposes, especially in light of the fact that the jury acquitted Russell on the charge involving domestic violence. (*People v. Friend, supra,* 47 Cal.4th at pp. 28-29.) Thus, any incorrect implications in the comments were harmless. (*People v. Doolin, supra,* 45 Cal.4th at p. 445; *People v. Bell* (1989) 49 Cal.3d 502, 539.)

VIII. PRESENCE IN THE COURTROOM

Russell next argues that his constitutional right to a public trial was violated when the trial court excluded his father from the courtroom during the jury trial requiring reversal. We disagree.

Near the beginning of trial, out of the presence of the jury, the trial court told Russell that it had heard of "two incidents with two different witnesses" (Artzer and Shults) in which Russell apparently said something. The trial court admonished Russell to "stop." The trial court also stated, "And don't let your family talk to people. I'll tell you, there are charges called dissuading a witness from testifying, and your family could be subjected to them .…"

At the outset of the second and final day of trial, outside the presence of the jury, the trial court stated the following on the record:

> "The bailiff received a complaint from Steve Hall, and Steve Hall indicated that the parents of defendant said something to him that he took as a threat this morning in the courthouse. He apparently said "Hello," and they said something back. And on its face, it didn't sound particularly threatening, but Steve Hall took it as a threat because of the tone of voice or the demeanor. So, I'm thinking at this point of just kicking the parents out of here."

The prosecutor agreed with the court, stating that Russell's father "just crossed through the bar [in the courtroom]. I told him he was not supposed to come up here, and he ignored me." After someone in the courtroom, apparently Russell's mother, denied

22.

saying anything to Mr. Hall, the court said that she could stay.**3** The trial court reiterated that it was time for Russell's father to leave, and he was removed from the courtroom. Before Russell's father was removed, the court admonished the gallery, stating:

> " … I am paying careful attention to facial expressions of audience members. And I'm telling anybody in the audience, I don't want to see a facial expression, I don't want to see a glare, I don't want to see anything that looks like an intimidation of the witnesses."

Initially, we note that this claim is forfeited because Russell failed to object on this ground below. "'A defendant "may, by his own acts or acquiescence, waive his right [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public. Unlike the jury trial which requires an express personal waiver [citation], the constitutional guarantee of a public trial may be waived by acquiescence of the defendant in an order of exclusion." [Citations.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1237; see also *People v. Gonzales* (2012) 54 Cal.4th 1234, 1292, fn. 27 [defendant forfeited right to public trial by failing to assert error below].)

In any event, Russell's claim has no merit. A criminal defendant has a constitutional right to a public trial, including the presence of friends and relatives. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *Presley v. Georgia* (2010) 558 U.S. 209, 210, 214-215 [reversed judgment where trial court excluded the public from the courtroom during voir dire due to space limitations and concern that prospective jurors might overhear observers' remarks].) However, the Sixth Amendment presumption of openness can be rebutted by a showing that exclusion of the public was necessary and narrowly tailored to protect some "'higher value.'" (*People v. Bui* (2010) 183 Cal.App.4th 675, 680-681 (*Bui*).) "[B]oth the defendant's and the public's right may be

---

**3**     The January 5, 2012, minute order states that Russell's mother, "who was not ordered removed from the courtroom, leaves and remains outside of the courtroom for the remainder of the trial."

23.

subjected to reasonable restrictions that are necessary or convenient to the orderly procedure of trial, and the trial court retains broad discretion to control courtroom proceedings in a manner directed toward promoting the safety of witnesses. [Citation.]" (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552 (*Esquibel*).) The right of the public to attend the trial may be curtailed under special circumstances without infringement on the constitutional right, but it cannot be denied altogether, and it cannot be restricted except when necessary. (*People v. Byrnes* (1948) 84 Cal.App.2d 72, 73.) "The exclusion of any *nondisruptive* spectator from a criminal trial should never be undertaken without a full evaluation of the necessity for the exclusion and the alternatives that might be taken. This evaluation should be reflected in the record of the proceedings." (*Esquibel, supra,* at p. 556, italics added.)

In *Esquibel*, the trial court excluded two friends of the defendant during the testimony of a single witness who was a minor because, although there was no indication of intimidation or harassment, the minor's mother was concerned the spectators might be gang members and would recognize the minor in the neighborhood. (*Esquibel, supra,* 166 Cal.App.4th at p. 554.) The appellate court held, "… the partial closure of a trial by the temporary exclusion of select supporters of the accused does not create an automatic violation of the constitutional right to a public trial." (*Ibid.*) The court found that, on the facts, there was no violation of the defendant's right to a public trial as the exclusion was temporary; the defendant did not need the spectators for support; and family members remained in the courtroom. The court reasoned that the purposes of the public trial right would not be served by finding a constitutional violation. (*Ibid.*)

In *Bui,* three spectators, including two of the defendant's family members, were excluded by a bailiff from the courtroom for about 40 minutes during jury selection. (*Bui, supra,* 183 Cal.App.4th at p. 679.) After the trial court was advised of the situation, the problem was rectified and the courtroom was opened to all who wanted to be present. (*Id.* at p. 686.) On appeal, the defendant maintained his right to a public trial had been

24.

violated and reversal was required. The appellate court made it clear that, while it did not condone the exclusion of any person from court proceedings, the short period of exclusion did not constitute a per se violation of the defendant's right to a public trial. It stated, "Given what we find to be the de minimis nature of the temporary exclusion of these individuals from only a limited portion of voir dire, we likewise find, as did the Supreme Court in [*People v.*]*Woodward* [(1992) 4 Cal.4th 376, 383-385], that this 'temporary "closure" did not violate defendant's fundamental constitutional right to a public trial.' (*Woodward, supra,* 4 Cal.4th at p. 379.)" (*Bui, supra,* at pp. 688-689, fn. omitted.)

Here, the exclusion of Russell's father was not temporary as in *Esquibel* and *Bui,* but was instead for the remainder of the last day of trial. But, more importantly, unlike the exclusions in *Esquibel* and *Bui*, Russell's father *was disruptive*.

As recently reiterated in *People v. Pena* (2012) 207 Cal.App.4th 944 (*Pena*):

> "'[T]he United States Supreme Court "has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial …. Such circumstances will be rare, however, and the balance of interests must be struck with special care." (*Waller [v. Georgia* (1984)] 467 U.S. [39,] 45.) Consequently both the defendant's and the public's right may be subjected to reasonable restrictions that are necessary or convenient to the orderly procedure of trial, and the trial court retains broad discretion to control courtroom proceedings in a manner directed toward promoting the safety of witnesses. (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121.) [¶] … In the case of a partial closure [(where some, but not all, spectators are asked to leave)], the Sixth Amendment public trial guarantee creates a "'presumption of openness'" that can be rebutted only by a showing that exclusion of the public was necessary to protect some "'higher value'" such as the defendant's right to a fair trial …. (See *Waller, supra,* 467 U.S. at pp. 44-45.) When such a "higher value" is advanced, the trial court must balance the competing interests and allow a form of exclusion no broader than needed to protect those interests. (*Ibid.*) Specific … findings are required to enable a reviewing court to determine the propriety of the exclusion. (*Id.* at p. 45.) … [¶] The identity of the spectator sought to be excluded is highly relevant in a partial closure situation …. The application of the

25.

above principles and the issue whether an accused has been denied his constitutional right to a public trial cannot be determined in the abstract, but must be determined by reference to the facts of the particular case. [Citation.]' [Citations.]" (*Pena, supra,* 207 Cal.App.4th at p. 949, fn. omitted.)

In *Pena,* the trial court excluded the entire families of the two defendants, who were brothers, during the last 30 minutes of testimony, closing argument and jury instruction. At one point early in the trial, defense counsel was told by the trial court to admonish "the family" not to interact with the jury inadvertently. Later, the clerk reported to the trial court that several jurors had felt family members of the defendants were following them during recess and making them uncomfortable. The prosecutor also reported an incident in which the defendants' mother had given her an intimidating look. (*Pena, supra,* 207 Cal.App.4th at pp. 947-948.) The trial court then excluded 10 to 12 family members, stating that, while it could hold a hearing to determine exactly which of the family members was responsible, that would delay the trial and be "'bad for the defense.'" (*Id.* at p. 948.)

On appeal, the defendants claimed the trial court committed reversible error by excluding members of their family. The court in *Pena* disagreed, stating that the trial court had identified three interests that required exclusion of the family members: the right of both defendants to a fair trial; the right of the jurors to feel free from intimidation; and the right of jurors to an undelayed conclusion of their duty at this late point in the trial. (*Pena, supra,* 207 Cal.App.4th at p. 948.) The court in *Pena* discussed various alternatives available to the trial court under the circumstances, but concluded that its actions were reasonable, finding them no broader than necessary to protect the interests identified by the trial court. (*Id.* at pp. 950-951.)

Here the trial court properly weighed the need for a public trial against the need for a fair and orderly trial. From the trial court's earlier statements, it is apparent that it was concerned with witness intimidation from the onset of trial and specifically warned

26.

Russell not to allow his family to speak to any witnesses. The subsequent incident the following morning between Mr. Hall and Russell's father, along with the fact that Russell's father ignored courtroom protocol and directives when he crossed the bar, was likely an indication to the trial court that Russell's father would continue to disrupt the orderly trial process. And although the trial court at first indicated it would remove both Russell's mother and father, it allowed Russell's mother to stay after she denied saying anything to the witness, making the exclusion of Russell's father a narrow and carefully tailored remedy.

Furthermore, the exclusion of Russell's father from the courtroom under these circumstances did not implicate any of the rationales underlying the right to public trial. "'"'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions .…'"'" [Citations.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." (*Waller v. Georgia, supra,* 467 U.S. at p. 46, fn. omitted.) The exclusion of Russell's father from the courtroom did not affect any of these goals.

## IX.  INEFFECTIVE ASSISTANCE OF COUNSEL

Russell finally contends in supplemental briefing that, if this court chooses not to reach the merits of the claims of error argued in his opening brief based on failure of counsel to adequately preserve them on appeal, he received ineffective assistance of counsel. However, we have addressed all issues on the merits and have found either no error or no prejudicial error and need not further address his claim of ineffective assistance of counsel.

# DISPOSITION

The judgment is affirmed.

_____
Franson, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Kane, J.